UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JEANETTE P.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-03309-MJD-JMS |
| | ) | |
| KILOLO KIJAKAZI,[2] | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON JUDICIAL REVIEW**

Claimant Jeanette P. requests judicial review of the final decision of the Commissioner of

the Social Security Administration ("Commissioner") denying her application for Supplemental

Security Income ("SSI") under Title XVI of the Social Security Act ("the Act"). *See* 42 U.S.C. §

1382. For the reasons set forth below, the Court **REVERSES** the decision of the Commissioner

and **REMANDS** this matter for further proceedings consistent with this Order.

**I.   Background**

This matter is Claimant's second request for judicial review of an unfavorable disability

determination. Claimant first applied for SSI on March 5, 2013, alleging a disability onset of

---

[1] In an attempt to protect the privacy interest of claimants for Social Security benefits, consistent
with the recommendation of the Court Administration and Case Management Committee of the
Administrative Office of the United States Courts, the Southern District of Indiana has opted to
use only the first name and last initial of non-governmental parties in its Social Security judicial
review opinions.
[2] Pursuant to Federal Rule of Civil Procedure 25(d), after the removal of Andrew M. Saul from
his office as Commissioner of the SSA on July 9, 2021, Kilolo Kijakazi automatically became
the Defendant in this case when she was named as the Acting Commissioner of the SSA.

December 31, 2009. [Dkt. 12-5 at 2.] On February 12, 2015, Claimant appeared for a video hearing before Administrative Law Judge ("ALJ") James G. Myles. [Dkt. 12-2 at 37.] ALJ Myles issued an unfavorable decision on March 26, 2015, [Dkt. 12-2 at 20], and the Appeals Council denied Claimant's request for review on August 27, 2016, [Dkt. 12-2 at 2.] On October 26, 2016, Claimant filed a Complaint in this Court seeking judicial review, Case No. 1:16-cv-02908-WTL-TAB (S.D. Ind). District Judge William T. Lawrence then reversed and remanded the ALJ's decision on January 16, 2018.

Upon remand, Claimant appeared for an in-person hearing before ALJ Gladys Whitfield on November 27, 2018. [Dkt. 12-8 at 85.] On April 9, 2019, ALJ Whitfield held a second hearing at which she heard the testimony of two medical experts and a vocational expert. [Dkt. 12-8 at 39.] On May 23, 2019, ALJ Whitfield issued an unfavorable decision and found that Claimant was not under a disability since March 5, 2013, the date Claimant's SSI application was filed. [Dkt. 12-8 at 29.] The Appeals Council again denied Claimant's request for review on October 16, 2020. [Dkt. 12-8 at 2.] Claimant timely filed her Complaint on December 30, 2020, seeking judicial review of ALJ Whitfield's decision. [Dkt. 1.]

## II.  Legal Standards

To be eligible for benefits, a claimant must have a disability pursuant to 42 U.S.C. § 423. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At step one, if the claimant is engaged in substantial gainful activity she is not disabled, despite her medical condition and other factors. 20 CFR § 416.920(a)(4)(i). At step two, if the claimant does not have a "severe" impairment (i.e., one that

significantly limits her ability to perform basic work activities), she is not disabled. 20 CFR §

416.920(a)(4)(ii). At step three, the Commissioner determines whether the claimant's impairment

or combination of impairments meets or medically equals any impairment that appears in the

Listing of Impairments, 20 CFR pt. 404, subpt. P, App. 1, and whether the impairment meets the

twelve-month duration requirement; if so, the claimant is deemed disabled. 20 CFR §

416.920(a)(4)(iii). At step four, if the claimant is able to perform her past relevant work, she is

not disabled. 20 CFR § 416.920(a)(4)(iv). At step five, if the claimant can perform any other

work in the national economy, she is not disabled. 20 CFR § 416.920(a)(4)(v).

Before continuing to step four, the ALJ must assess the claimant's residual functional capacity

("RFC") by "incorporat[ing] all of the claimant's limitations supported by the medical record."

*Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019).

In reviewing a claimant's appeal, the Court will reverse only "if the ALJ based the denial

of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950

F.3d 369, 373 (7th Cir. 2020). An ALJ need not address every piece of evidence but must

provide a "logical bridge" between the evidence and her conclusions. *Varga v. Colvin*, 794 F.3d

809, 813 (7th Cir. 2015). Thus, an ALJ's decision "will be upheld if supported by substantial

evidence," which is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). This Court may

not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its

judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Where

substantial evidence supports the ALJ's disability determination, the Court must affirm the

decision even if "reasonable minds could differ" on whether the claimant is disabled. *Id.*

### III.   ALJ Decision

ALJ Whitfield first determined that Claimant had not engaged in substantial gainful activity since March 5, 2013, the date Claimant filed her SSI application. [Dkt. 12-8 at 14.] At step two, the ALJ found that Claimant had the following severe impairments: "obesity; chronic obstructive pulmonary disease (COPD)/asthma; diabetes mellitus; degenerative joint disease of the knees; lumbar disease; unspecified depression/mood disorder; anxiety, unspecified; and personality disorder, unspecified (20 CFR 416.920(c))." [Dkt. 12-8 at 14.] At step three, the ALJ found that Claimant's impairments did not meet or medically equal a listed impairment during the relevant time period. [Dkt. 12-8 at 15.] The ALJ then found that, during the relevant time period, Claimant had the residual functional capacity ("RFC") to

> lift and carry 10 pounds occasionally and less than 10 pounds frequently; stand and/or walk for up to 2 hours per 8-hour workday and sit for about 6 hours per 8-hour workday, with normal breaks. She can never climb ramps, stairs, ladders, ropes, or scaffolds. The claimant is able to occasionally balance and stoop, but never kneel, crouch, or crawl. She can never operate foot controls. She can tolerate only occasional exposure to extreme heat, extreme cold, and environmental irritants, such as fumes, odors, dust, gases, and poorly ventilated areas. The claimant cannot work at unprotected heights and must avoid all use of hazardous moving machinery. She is capable of performing unskilled work, but cannot perform job duties requiring fast-paced production, tandem tasks, or teamwork. In addition, she is limited to only occasional interaction with coworkers, supervisors, and the public.

[Dkt. 12-8 at 19.]

At step four, ALJ Whitfield found that Claimant did not have any past relevant work and thus was not able to perform such. [Dkt. 12-8 at 27.] At step five, relying on testimony from a vocational expert ("VE"), the ALJ determined that Claimant was able to perform jobs that exist in significant numbers in the national economy, such as document preparer, addresser, inspector/tester/sorter/sampler, and production work helper. [Dkt. 12-8 at 27-28.] Accordingly, the ALJ concluded that Claimant was not disabled. [Dkt. 12-8 at 28.]

4

## IV.   Discussion

Claimant advances three main arguments in support of her request to reverse the Commissioner's decision. She argues that ALJ Whitfield (1) failed to properly consider Claimant's treating source opinions, (2) failed to question the VE regarding the validity of the availability of the jobs cited, and (3) failed to properly apply SSR 16-3p. [Dkt. 14.] In response to each argument, the Commissioner asserts that the ALJ's decision is based on substantial evidence and the issues raised by Claimant do not constitute reversable error. [Dkt. 15.]

### A.   Treating Source Issue

Claimant first argues that the ALJ erred by "providing insufficient and unsubstantiated reasoning for dismissing the long time treating provider's opinion," and asserts that the longitudinal record "supports a finding that [Claimant's treating source's opinion] is entirely consistent with the evidence and ought to be given controlling weight." [Dkt. 14 at 4.]

Where a claim is filed before March 27, 2017, as is the case here, the claimant's treating physician's opinion "is entitled to controlling weight if it is well supported by medical findings and consistent with other record evidence." *Gerstner v. Berryhill*, 879 F.3d 257, 261 (7th Cir. 2018) (citing 20 C.F.R. § 404.1527(c)(1)); *Collins v. Astrue*, 324 Fed App'x 516, 520 (7th Cir. 2009). Where an ALJ chooses not to give a treating physician's opinion controlling weight, she is required to consider the following factors to decide how much weight to afford the opinion: (1) the examining relationship, (2) the treatment relationship, including the length and frequency of the relationship and the nature and extent of the relationship, (3) supportability of the opinion, (4) consistency of the opinion, (5) and specialization. 20 CFR § 404.1527(c); *Scrogham v. Colvin*, 765 F.3d 685, 697 (7th Cir. 2014).

On February 8, 2018, one of Claimant's treating physicians, Dayna Ridderman, MD, submitted a partially-completed Physical RFC Questionnaire, providing the following: she had treated Claimant about every three months for about four years; Claimant's diagnoses included hypertension, diabetes mellitus, obesity, asthma, bipolar disorder, neuropathy, and knee osteoarthritis, and her prognosis was fair; Claimant's symptoms included neuropathy and numbness/tingling in feet, knee pain with movement and standing/walking, and these symptoms could be severe; Claimant's pain and other symptoms were expected to last at least 12 months and were frequently severe enough to interfere with attention and concentration; emotional factors contributed to the severity of Claimant's symptoms and functional limitations; Claimant's depression and bipolar disorder specifically affected her physical condition; Claimant was incapable of even low-stress jobs due to her labile mood; Claimant was only able to walk one-to-two city blocks without rest or severe pain; Claimant was only able to sit and stand/walk for less than two hours during an eight-hour workday; and Claimant must use a cane while standing or walking. [Dkt. 12-13 at 309-13.] ALJ Whitfield afforded "only partial weight" to Dr. Ridderman's opinion, stating:

> the clinical findings, the longitudinal medical record, and the claimant's reported activities show the claimant is and was less restricted than determined by Dr. Ridderman. Dr. Ridderman's opinion appears on a fill-in-the-blank form, with only marginal notes attached to the form. Dr. Ridderman failed to cite to medical testing results or objective observations to support her conclusions as to the claimant's functional capacity. Indeed, she noted neuropathy in the feet as a symptom; however, there is [sic] objective testing or physical examination findings to support this symptom. Moreover, Dr. Ridderman's extreme limitations are inconsistent with her own treatment records. For example, Dr. Ridderman saw the claimant the day prior to the date of her opinion. Interestingly, findings in physical examination were largely unremarkable (Exhibit 36F/19). Moreover, a majority of physical examinations throughout the record documented some decreased range of motion of the knees and slow gait, but were otherwise largely unremarkable, with no mention of an assistive device (see e.g. Exhibits 10F/23, 55; 11F/15, 134; 17F/21-22, 25, 39, 59; 18F/55; 33F/2; 36F/1, 4, 16, 23, 27, 30, 32, 43-44, 198; 37F/300,

347). For all of these reasons, the undersigned affords Dr. Ridderman's opinion only partial weight.

[Dkt. 12-8 at 24-25.]³ However, the ALJ's assessment of Dr. Ridderman's opinion is not based on substantial evidence.

Initially, the ALJ should not have found Dr. Ridderman's opinion unsupported because she utilized a fill-in-the-blank form and failed to include citations. The "regulations do not call for check-box forms to include a contemporaneous submission of, or references to, medical evidence." *Jenkins v. Colvin*, 2016 WL 6889167, at *2 (S.D. Ind. Nov. 23, 2016). And "[a]lthough by itself a check-box form might be weak evidence, the form takes on greater significance when it is supported by medical records." *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (citing *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999)). Thus, the use of a check-box or fill-in-the-blank form in itself does not render a treating physician's answers unsupported or non-credible.⁴ *Jenkins*, 2016 WL 6889167, at *2.  Nonetheless, despite the ALJ's contention otherwise, Dr. Ridderman's opinion is substantiated by medical records and is consistent with her own treatment records. For example, there is plenty of documentation regarding Claimant's diabetic neuropathy spanning from February 2017 to November 2018. *See*, *e.g.*, [Dkt. 12-13 at 288; Dkt. 12-14 at 269; Dkt. 12-14 at 266; Dkt. 12-14 at 260; Dkt. 12-14 at 249; Dkt. 12-14 at 241; Dkt. 12-14 at 234] (Dr. Ridderman); [Dkt. 12-15 at 50] (Alexander Radnovich, MD); [Dkt. 12-15 at 137] (William Jones III, MD); and [Dkt. 12-15 at 251; Dkt. 12-16 at 51; Dkt. 12-16 at 75] (Heather Fretwell, MD).

---

³ The ALJ did not mention other prominent treating sources in Claimant's record, such as Moshina Kashif, MD, and Palmer Mackie, MD.

⁴ To be sure, the Physical RFC Questionnaire completed by Dr. Ridderman is quite standard in disability cases. In fact, the approved Physical RFC form available from the Social Security Administration is just as much—if not more—of a check-box form. *See* POMS DI 24510.055.

Additionally, there is ample mention of assistive devices throughout the record from July 2013 to August 2018.[5] This includes multiple prescriptions for those devices, despite a prescription not being required by the regulations.[6] *See*, *e.g.*, [Dkt. 12-13 at 117-18] (Moshina Kashif, MD, discussing Claimant's request for a cane and ordering a straight single point cane); [Dkt. 12-13 at 110, 111, 112] (Dr. Kashif documenting Claimant's prescription for a cane due to her bilateral knee osteoarthritis and noting that Claimant is "asking for a cane for chronic knee pain and gait instability"); [Dkt. 12-7 at 169] (Dr. Kashif's prescription for Claimant's bariatric straight cane due to knee pain); [Dkt. 12-7 at 243] (Dr. Kashif noting that Claimant's "pain gets worse with walking/standing, she uses cane to walk"); [Dkt. 12-13 at 233] (Nurse Practitioner Cristina Coner instructing Claimant to "continue to use cane for balance"); [Dkt. 12-13 at 198] (Palmer Mackie, MD, noting that Claimant had "difficulty moving, changing positions, walking; gait w/ cane, limp"); [Dkt. 12-7 at 203] (Dr. Ridderman noting that Claimant's "knees hurt, feels like they crunch when she bends them--has to use cane . . . L knee bothering her the most"); [Dkt. 12-7 at 205] (Dr. Ridderman noting Claimant's "slowed gait with cane"); [Dkt. 12-13 at 177] (Dr. Mackie noting that Claimant was having "severe left knee pain," and that "it's giving out more; she's having to use her cane all of the time now"); [Dkt. 12-7 at 195] (Dr. Ridderman noting that Claimant had a "better gait--no cane today," but was "still slow"); [Dkt. 12-7 at 183; Dkt. 12-7 at 462; Dkt. 12-7 at 458] (Dr. Ridderman noting Claimant had a "slowed gait, using

---

[5] The Court notes that Claimant's brief states that "Dr. Ridderman does not mention use of an assistive device in any of her records, except one." [Dkt. 14 at 11.] This is not true. And while the Court should not need to undertake the parties' research or construct the parties' arguments for them, the Court will also not allow an ALJ decision to stand where it is not based on substantial evidence. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) ("we cannot uphold an administrative decision that fails to mention highly pertinent evidence") (citations omitted).
[6] The regulations define an assistive device as "any device that you use to improve your stability, dexterity, or mobility," and state that "[w]e do not require that you have a specific prescription for the assistive device." 20 CFR Part 404 Appendix 1 of Subpart P, 1.00C6a.

cane, slow to stand up"); [Dkt. 12-13 at 152] (Dr. Mackie noting that Claimant was "walking today w/o cane"); [Dkt. 12-13 at 72] (Dr. Ridderman noting that Claimant was requesting a brace for her knee pain); [Dkt. 12-13 at 4-5] (C. Melton Doxey III, MD, after diagnosing Claimant with degenerative joint disease of right and left knees, noting that he discussed "home health, physical therapy, wheelchair, durable medical equipment, etc." with Claimant); [Dkt. 12-13 at 42] (Licensed Practical Nurse Ward Thompson stating that Claimant "would like an order for a walker" after she "fell down 4 stairs"; Dr. Ridderman noting that Claimant was "told by ortho needed walker so she doesn't fall"); [Dkt. 12-13 at 35] (Dr. Ridderman noting that Claimant was "wondering about walker. Ortho told her to get one--knees bad enough they [are] bone [on] bone and at risk of them giving out and [Claimant] falling"); [Dkt. 12-13 at 37] (Dr. Ridderman ordering a rolling walker due to Claimant's bilateral knee osteoarthritis); [Dkt. 12-13 at 13] (Claimant's prescription for a rolling walker); [Dkt. 12-13 at 19] (Laura Nader, MD, noting that Claimant was "having falls," "using walker," and experiencing "lots of pain" when "sitting, lying, walking" due to arthritis in back and knees); [Dkt. 12-13 at 21] (Dr. Nader noting that Claimant was "stable with walker"); [Dkt. 12-13 at 265-66] (consultive examiner Merlyn Malola, MD, noting that Claimant uses a walker "all the time to keep her balance and because of her two bilateral knee pain," Claimant "brought walker to the exam," "demonstrated the need for the walker [in] all her activity," and "is dependent on the walker fulltime"); [Dkt. 12-13 at 275] (Thomas Smith, Ph.D., HSPP, noting that Claimant "was an obese woman who walked slowly with a walker"); [Dkt. 12-14 at 155-56] (Occupational Therapist Jenifer Patrick noting Claimant uses a cane and a rolling walker, and that she uses a motorized scooter when shopping (although home health aides assist with shopping)); [Dkt. 12-14 at 240] (Dr. Ridderman noting that Claimant was given a prescription for a motorized chair for her chronic pain); and [Dkt. 12-15 at

252] (Dr. Fretwell noting that Claimant "walks with a cane, slowly and carefully, some sway side to side").

Claimant's need for an assistive device—whether the cane or the walker, both of which were prescribed—is further supported by her consistent diagnosis of osteoarthritis in the knees as well as medical imaging. *See* [Dkt. 12-7 at 82] (April 2013 x-ray, ordered by Dr. Kashif, showing "[m]oderate medical joint space narrowing and spurring in all 3 compartments" in both knees); [Dkt. 12-7 at 198] (December 2014 x-ray, ordered by Dr. Ridderman, showing "[m]oderately severe medial joint space narrowing" and "[m]inimal spurring in all 3 compartments"); [Dkt. 12-13 at 151] (April 2015 MRI, ordered by Dr. Mackie, showing "medial meniscus–large complex radial tear of posterior horn," "tricompart-patellofemoral is most severe and mod-severe medial compartment," "effusions and Baker's cyst," and "changes in bone marrow-reconversion of fatty hematopoietic bone marrow in femur"); and [Dkt. 12-13 at 2] (September 2015 x-ray, ordered by Dr. Doxey, showing "significant medial joint space loss with nearly bone-on-bone apposition and significant patellofemoral arthrosis of the left knee and a varus malalignment"). This evidence undercuts both the ALJ's decision to discredit Dr. Ridderman's opinion as well as the ALJ's inexplicable finding "that an assistive device is not medically necessary," [Dkt. 12-8 at 22], which clearly violates the maxim that "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996).

Claimant's mental and emotional conditions, as noted in Dr. Ridderman's opinion, are also well-documented in the record from April 2014 to November 2018. *See*, *e.g.*, [Dkt. 12-13 at 221] (Dr. Mackie documenting Claimant's depression); [Dkt. 12-13 at 216; Dkt. 12-13 at 214; Dkt. 12-13 at 197; Dkt. 12-13 at 187; Dkt. 12-13 at 177; Dkt. 12-13 at 169; Dkt. 12-13 at 151]

(Dr. Mackie documenting Claimant's depression/anxiety); [Dkt. 12-7 at 226; Dkt. 12-7 at 205; Dkt. 12-7 at 183; Dkt. 12-7 at 462; Dkt. 12-13 at 74; Dkt. 12-13 at 33; Dkt. 12-13 at 288] (Dr. Ridderman documenting Claimant's depression); [Dkt. 12-13 at 195] (Paul Moe, MD, documenting Claimant's bipolar disorder); [Dkt. 12-13 at 284] (Marcia Lomax, M.S., documenting Claimant's depressive disorder diagnosis);  [Dkt. 12-13 at 70; Dkt. 12-13 at 62; Dkt. 12-13 at 26; Dkt. 12-13 at 17] (Licensed Clinical Social Worker Cara Hargett documenting Claimant's major depressive disorder diagnosis); [Dkt. 12-13 at 51] (LCSW Hargett documenting Claimant's generalized anxiety disorder); [Dkt. 12-13 at 274, 276] (Dr. Smith noting that Claimant's "emotions were labile" and listing her diagnoses as bipolar I disorder, PTSD, panic disorder, and agoraphobia); [Dkt. 12-15 at 4] (Gregory Singleton, MD, documenting Claimant's bipolar disorder diagnosis); [Dkt. 12-15 at 21] (Qualified Behavioral Health Provider Erica Rutledge documenting Claimant's major depressive disorder and borderline personality disorder); [Dkt. 12-15 at 53] (Dr. Radnovich documenting Claimant's bipolar I disorder, PTSD, generalized anxiety disorder, binge eating disorder, and borderline personality disorder); [Dkt. 12-15 at 87] (QBHP Rutledge documenting Claimant's bipolar I disorder and borderline personality disorder); [Dkt. 12-15 at 104] (Dr. Radnovich documenting Claimant's bipolar I disorder); [Dkt. 12-15 at 139-40] (William Jones III, MD, documenting Claimant's bipolar disorder, PTSD, generalized anxiety disorder, and binge eating disorder); [Dkt. 12-15 at 174] (Dr. Jones documenting Claimant's bipolar I disorder, generalized anxiety disorder, and PTSD); [Dkt. 12-13 at 314] (QBHP Rutledge documenting Claimant's bipolar I disorder, borderline personality disorder, PTSD, generalized anxiety disorder, and binge eating disorder; Dr. Fretwell attesting to the report); [Dkt. 12-14 at 106] (upon discharge from IUH Methodist Hospital, Aldo Martinez, MD, documenting Claimant's depression and new diagnosis

of conversion disorder); and [Dkt. 12-14 at 227] (Dr. Fretwell's Mental Impairment Questionnaire listing Claimant's diagnoses as bipolar I disorder, borderline personality disorder, generalized anxiety disorder, PTSD, and binge eating disorder).

Taking all of this evidence into account, ALJ Whitfield's decision to discredit Dr. Ridderman's opinion because it appeared on a fill-in-the-blank form, was not supported by medical evidence, and was inconsistent with her own treatment record is plainly erroneous because it is contrary to the evidence in the record.[7]

Accordingly, because Dr. Ridderman's opinion is well supported and consistent with the medical record, the ALJ should have given it controlling weight. *Gerstner*, 879 F.3d at 261 (citing 20 C.F.R. § 404.1527(c)(1)). But "[e]ven when an ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ is not permitted simply to discard it." *Scrogham*, 765 F.3d at 697. Rather, the ALJ must consider the factors enumerated in 20 C.F.R. § 404.1527(d). *See Ray v. Saul*, 861 Fed. App'x 102, 105-06 (7th Cir. 2021) ("While we will not vacate or reverse an ALJ's decision based solely on a failure to expressly list every checklist factor, we do expect the ALJ to analyze the treating source's medical opinion 'within the multifactor framework delineated' in the regulation.") (citing *Karr*, 989 F.3d at 512; *Gerstner*,

---

[7] Instead of crediting Dr. Ridderman, the ALJ gave the opinion of medical expert Lee Fischer, MD, "significant weight because it is consistent with and supported by the evidence of record." [Dkt. 12-8 at 24.] This determination, however, is also not based on substantial evidence. Dr. Fischer consistently overlooked pertinent evidence in Claimant's record. *See* [Dkt. 12-8 at 46-64]. Moreover, "[t]he opinion of a consulting physician who personally examines the claimant . . . is also given more weight than non-examining sources." *Whitehead v. Saul*, 841 Fed. App'x 976, 981 (7th Cir. 2020) (citing 20 C.F.R. § 404.1527(c)(2)). Dr. Fischer did not examine Claimant, nor did he hear any of her testimony; the medical experts testified at a hearing more than four months after the hearing in which Claimant provided her medical testimony. *See* [Dkt. 12-8 at 85] (November 27, 2018, hearing in which Claimant testified); *see also* [Dkt. 12-8 at 39] (April 9, 2019, hearing in which the medical experts testified).

879 F.3d at 263). "Generally acknowledging the regulatory factors is insufficient." *Ray*, 861 Fed. App'x at 105-06 (citing *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010)).

Here, in deciding to afford Dr. Ridderman's opinion only partial weight, ALJ Whitfield did not analyze Dr. Ridderman's opinion within the requisite framework; the ALJ made no mention of "the length, nature, and extent of the physician-applicant relationship" and did not properly consider "the degree of consistency between the opinion and other evidence in the record." *Collins*, 324 Fed. App'x at 520-21. Additionally, the ALJ clearly ignored the volumes of evidence that undercut her decision to discredit Dr. Ridderman's opinion. These errors require remand.

### B.  VE Issue

Next, Claimant argues that ALJ Whitfield "erroneously accepted, uncritically, testimony from the vocational expert that arguably extinct jobs exist in significant numbers in the national economy that [Claimant] could perform." [Dkt. 14 at 4.] Specifically, she asserts that the jobs provided by the VE are "questionable in terms of their current existence" due to the nature of the jobs as well as the "grossly insignificant numbers" provided by the VE. [Dkt. 14 at 18.]

"The Social Security Administration does not try to determine whether an applicant would have any real chance of landing a job, . . . but it does require a determination of whether work that the applicant is capable of doing 'exists in significant numbers' in the economy." *Herrmann v. Colvin*, 772 F.3d 1110, 1112-13 (7th Cir. 2014) (citing 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 416.966(a)). A claimant is disabled from working "[i]f the only jobs that the applicant is physically and mentally capable of doing no longer exist in the American economy (such as pin setter, phrenologist, leech collector, milkman, pony express rider, and daguerreotypist)," or "if there is an insignificant number of such jobs." *Id.*

Here, the VE testified, and the ALJ accepted, that Claimant was capable of working as a document preparer, DOT 249.587-018, of which there are 45,000 nationally; an addresser, DOT 209.587-010, of which there are 6,000 nationally; an inspector/tester/sorter/sampler, specifically a table worker, DOT 739.687-182, of which there are 10,000 nationally; and a production work helper, specifically a waxer, DOT 779.687-038, of which there are 5,000 nationally. [Dkt. 12-8 at 75-76.] The VE then reduced the number of inspector/tester/sorter/sampler jobs from 10,000 to 5,000 nationally based on the ALJ's limitation of no fast-paced production, no tandem tasks, and no teamwork. [Dkt. 12-8 at 75-76.] Then, based on the ALJ's limitation of no ramps—which the VE did not hear initially—the VE reduced the number of all four jobs by 30%. [Dkt. 12-8 at 81.] When asked how he arrived at this 30% reduction, the VE stated, "I haven't done any kind of study. This is just from my, you know, observations . . . So that's more of an educated guess on my part." [Dkt. 12-8 at 81.] The VE additionally testified that, while the use of a cane would not affect any of these jobs, the use of a walker would "provide a real issue with the person being able to perform the job[s]" if the walker did not have a shelf because "at times a person may need to carry some product. So, if the person has two hands on a walker, they need a place to put the product." [Dkt. 12-8 at 78.][8] Based on this testimony, including the VE's 30% reduction of available jobs, the ALJ found that Claimant could work as a document preparer, DOT 249.587-018, noting that there are 31,500 nationally; an addresser, DOT 209.587-010, noting that there are 4,200 nationally; an inspector/tester/sorter/sampler, DOT 739.687-182, noting there are 3,500

---

[8] Claimant was present with her walker, "which has no seat and no platform for carrying objects," when the VE testified. [Dkt. 12-8 at 79.] The VE then testified that Claimant's was indeed the type of walker that would require an accommodation from an employer. [Dkt. 12-8 at 79.] The ALJ did not address this in her decision.

nationally; and a production work helper, DOT 779.687-038, noting there are 3,500 nationally.

[Dkt. 12-8 at 28.]

Again, the ALJ's determination is erroneous. First, the ALJ cites to the larger job groups

of inspector/tester/sorter/sampler and production work helper, while the VE testified regarding

specific representative occupations within those job groups. Indeed, DOT 739.687-182 and DOT

779.687-038 refer to the positions of table worker and waxer, respectively, not an

inspector/tester/sorter/sampler and a production work helper as the ALJ states. This is

problematic. *See Browning v. Colvin*, 766 F.3d 702, 708-09 (7th Cir. 2014).

Second, the only public source the VE cited for the aforementioned numbers was the

DOT. As Claimant highlights, this brings the Court to

> an issue that has been simmering with respect to social security claims for some
> time—the "obsolete" Dictionary of Occupational Titles (DOT). *See Spicher v.
> Berryhill*, 898 F.3d 754, 759 (7th Cir. 2018) (quoting *Herrmann v. Colvin*, 772 F.3d
> 1110, 1113 (7th Cir. 2014)[)]. The DOT is no longer published, was last updated in
> 1991, and much of the information it contains describes jobs as they existed in
> 1977. *Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014). "No doubt many of
> the jobs have changed and some have disappeared." *Id.*; *see also Spicher v.
> Berryhill*, 898 F.3d 754, 759 (7th Cir. 2018).

*Gulley v. Berryhill*, 2019 WL 668836, at *3 (E.D. Wis. Feb. 19, 2019). Understanding this, the

jobs identified by the VE likely no longer exist—certainly not in the manner suggested by the

DOT. For example, the full title of the document preparer job is "document preparer,

microfilming," and is defined as one who

> [p]repares documents, such as brochures, pamphlets, and catalogs, for
> microfilming, using paper cutter, photocopying machine, rubber stamps, and other
> work devices: Cuts documents into individual pages of standard microfilming size
> and format when allowed by margin space, using paper cutter or razor knife.
> Reproduces document pages as necessary to improve clarity or to reduce one or
> more pages into single page of standard microfilming size, using photocopying
> machine. Stamps standard symbols on pages or inserts instruction cards between
> pages of material to notify MICROFILM-CAMERA OPERATOR (business ser.)
> 976.682-022 of special handling, such as manual repositioning, during

microfilming. Prepares cover sheet and document folder for material and index card for company files indicating information, such as firm name and address, product category, and index code, to identify material. Inserts material to be filmed in document folder and files folder for processing according to index code and filming priority schedule.

DOT 249.587-018 (DOCUMENT PREPARER, MICROFILMING (business ser.)). As some courts have already acknowledged, "[a]lthough microfilming might not be completely obsolete, it seems fair to suspect it has changed dramatically since 1977 or even 1991 'given the shift to digital storage and advances in scanning technology.'" *Gulley*, 2019 WL 668836, at *4 (quoting *Dearth v. Berryhill*, 2018 WL 1225045, at *4 (N.D. Ind. Mar. 9, 2018)).

Similarly, intuition suggests that the job of an addresser, which is defined as one who "[a]ddresses by hand or typewriter, envelopes, cards, advertising literature, packages, and similar items for mailing" and "[m]ay sort mail," DOT 209.587-010 (ADDRESSER (clerical) alternate titles: addressing clerk; envelope addresser), "may well have been automated in the decades since the DOT was last updated." *Gulley*, 2019 WL 668836, at *4 (referring to the position of a check weigher). It is error for an ALJ to "uncritically accept[] the job numbers proffered by the vocational expert without attempting to determine whether the numbers are still current when common sense suggests they may not be." *Id.* (citing *Dimmett v. Colvin*, 816 F.3d 486, 489 (7th Cir. 2016)). That is what happened here.

Moreover, the remaining positions should have given ALJ Whitfield pause based on the limitations she provided to the VE. *See Dimmett*, 816 F.3d at 489. For example, a table worker is defined as one who "[e]xamines squares (tiles) of felt-based linoleum material passing along on conveyor and replaces missing and substandard tiles." DOT 739.687-182 (TABLE WORKER (fabrication, nec) alternate titles: spotter). Yet the ALJ provided the VE with the limitation of no hazardous moving machinery. [Dkt. 12-8 at 75.] The Court is unsure how this limitation could

coexist with a job requiring direct contact with a moving conveyor. Additionally, a waxer is defined as one who "[b]rushes coat of wax on glass speedometer and radio dials, leaving stenciled numbers and figures free for etching." DOT 779.687-038 (WAXER (glass products) alternate titles: glass-etcher helper). Yet, the ALJ provided the VE with the limitation of only occasional exposure to environmental irritants. [Dkt. 12-8 at 74.] Again, it seems this limitation could not coexist with a working environment focused on glass etching.

Third, the DOT lacks any "statistics regarding the number of jobs in a given job category that exist in the local, state, or national economy." *Herrmann*, 772 F.3d at 1113. "[W]hile there are unofficial estimates of jobs in some categories, the vocational experts do not in general, and the vocational expert in this case did not, indicate what those data sources are or vouch for their accuracy." *Browning*, 766 F.3d at 709. Although the VE did state that he also relied on his own experience and observations, "he didn't explain how impressions from unspecified past experience and knowledge could enable him to determine numbers of particular jobs." *Herrmann*, 772 F.3d at 1113. Indeed, he noted he did not rely on any kind of study and admitted his testimony was based on an educated guess. [Dkt. 12-8 at 81.] *See Herrmann*, 772 F.3d at 1114 ("We do not know how the vocational expert in this case calculated the numbers to which he testified. Nothing in the record enables us to verify those numbers, which the administrative law judge accepted").

In sum, the ALJ's "blind reliance on the vocational expert's testimony" does not constitute a reasoned analysis of Claimant's disability application. *Dimmett*, 816 F.3d at 490. Accordingly, ALJ Whitfield's determination that Claimant could perform jobs that exist in significant numbers in the national economy is not based on substantial evidence. This error requires remand.

17

### C.  SSR 16-3p Issue

Claimant additionally argues that the ALJ erred by discrediting Claimant's subjective symptoms without reasoning, in violation of SSR 16-3p. [Dkt. 14 at 19.]

When evaluating a claimant's subjective symptoms, SSR 16-3p requires an ALJ to consider (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms, (3) any precipitating and aggravating factors, (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms, (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms, (6) any measures the claimant uses or has used to relieve pain or other symptoms, and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c)(3); SSR 16-3p, 2017 WL 5180304, at *3.

Even though the ALJ briefly acknowledged Claimant's testimony[9] regarding her back and knee pain, her need for an assistive device, and failed treatments, *see* [Dkt. 12-8 at 20], ALJ Whitfield determined that Claimant was not as limited as she claims. [Dkt. 12-8 at 21.] The ALJ supports this determination with the following assertions:

> Despite her allegations, the record shows that claimant reported going to the library to borrow books and movies to occupy her time (Exhibit 37F/84). She also reported having multiple friends who were excellent emotional supports for her (Exhibit 11F/166). She helped with a food truck and was actually given the liberty to create the menu (Exhibit 37F/95). Progress notes show the claimant married in 2014 and gained custody of her 12-year-old granddaughter (Exhibit 10F/51). She reported

---

[9] The Court finds it troubling that the only questions the ALJ asked Claimant at the hearing pertained to the last time she worked, her date of birth, her height and weight, her education, whether her left or right hand was dominant, whether she had applied for unemployment benefits or workers compensation, her former drug use, and whether Claimant used a cane or a walker everywhere she went. [Dkt. 12-8 at 94-97.] *See Cullinan v. Berryhill*, 878 F.3d 598, 605 (7th Cir. 2017) ("The ALJ has the burden to develop the record and assess whether symptoms are disabling") (citing *Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014)).

regularly attending Narcotics Anonymous meetings and admitted she was very involved in volunteering at her church (Exhibits 11F/122; 17F/1; 31F/1). In her disability filings, the claimant stated she did not need reminders to take medication (Exhibit 5E/4). She also reported being able to take public transportation, shop in stores once a month, manage her finances, watch television, and read very well (Exhibits 5E/5, 6; 22E/5; 24E/5). Treatment notes show claimant regularly denied side effects of her pain medication (see e.g. Exhibits 36F/7, 15, 22, 30, 43; 37F/46). The claimant's admissions and reported activities demonstrate the claimant is and was less limited than she alleges.

[Dkt. 12-8 at 20-21.] It is difficult to trace the ALJ's reasoning here. Frankly, none of the daily activities mentioned support the ALJ's determination that Claimant was less limited than alleged. *See Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) ("the ALJ did not explain why [performing daily activities] was inconsistent with [the claimant's] description of her pain and limited mobility"); *see also Scrogham*, 765 F.3d at 700 ("The 'sporadic performance of [household tasks or work] does not establish that a person is capable of engaging in substantial gainful activity'") (quoting *Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993)). This is especially true since the ALJ did not paint a full picture of Claimant's record.

For example, Exhibit 37F/84 makes no mention of Claimant going to the library to borrow books or movies. [Dkt. 12-15 at 85.] In fact, it does not mention Claimant's daily activities whatsoever. Although Exhibit 11F/166 does note that "[t]he patient reports having a multitude of friends who are excellent emotional supports for her," [Dkt. 12-7 at 395], this assessment is dated March 14, 2014—five years prior to the ALJ's decision. This could certainly have changed—especially considering Claimant's emotional changes—and, even if not, the Court is unsure what a support system has to do with Claimant's subjective symptoms and related limitations. Exhibit 37F/95 states that Claimant "reported that she will be helping with a food truck this week and has been given the liberty to create the menu. She is looking forward to this opportunity because she is passionate about cooking and hopes it will be prosperous." [Dkt. 12-

15 at 96.] This was from October 17, 2017, is the only mention of Claimant helping with a food

truck, and gives no insight as to how that help occurred—if it actually came to fruition. *See* [Dkt.

12-12 at 23, 24, 35] (Claimant noting that she is no longer able to cook or clean because of her

illnesses). And although there is documentation of Claimant attending NA meetings and

volunteering with her church, *see* [Dkt. 12-7 at 351 (11F/122); Dkt. 12-13 at 46 (17F/1); Dkt. 12-

13 at 314 (31F/1)], the ALJ failed to mention documentation in which Claimant reported she

"don't go anywhere, don't socialize; recently stopped goin' to church" [Dkt. 12-13 at 270],

"enjoyed being involved with her church volunteering opportunities however transportation is a

barrier" [Dkt. 12-16 at 20], and that she depends on her home aides for transportation [Dkt. 12-

16 at 13]. In fact, there is substantial evidence that Claimant is only able to complete activities of

daily living with significant help from others, including her home aides. *See*, *e.g.*, [Dkt. 12-14 at

29, 155] (hospital records noting that Claimant's home health aides help with bathing three times

a week, Claimant requires assistance for home management, Claimant is entirely dependent on

her granddaughter to do laundry, entirely dependent regarding transportation, and requires

assistance from aides with shopping).

Moreover, Claimant's own function reports paint a very different picture that what the

ALJ describes:

> it takes me an hour to really get up because of my back & knee pain. I wash my
> face, brush my teeth and then I'm out of breath so I sit down for about 10 min, then
> it takes me another 20 min to put my clothes on and I go to the first floor of my
> house where I stay all day so that I can eat and watch T.V. until bed.

[Dkt. 12-12 at 22; Dkt. 12-12 at 34.] Claimant additionally revealed that it is her granddaughter

who takes care of her—not the other way around—including providing daily medication

reminders. [Dkt. 12-12 at 23, 24, 35.] The Court could go on, but it is clear that the ALJ has

impermissibly used a "sound-bite approach" to evaluate Claimant's record and her daily

activities, *Scrogham*, 765 F.3d at 698, and "ignored [Claimant's] qualifications as to *how* [s]he carried out those activities," *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008) (emphasis in original).

Accordingly, the ALJ's decision to discredit Claimant's alleged symptoms requires reversal because it lacks explanation and support by relying "on inferences that are not logically based on specific findings and evidence." *Cullinan*, 878 F.3d at 603 (citing *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)).[10]

## V.  Conclusion

For the reasons set forth above, the Commissioner's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this Order.

SO ORDERED.

Dated:  24 FEB 2022

_____
Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically
on all ECF-registered counsel of record via
email generated by the Court's ECF system.

---

[10] Claimant additionally argues that the ALJ failed to explain the rationale behind her RFC determination. [Dkt. 14 at 25.] On remand, the Commissioner shall be sure that **all** of Claimant's limitations, including those of concentration, persistence, or pace, are fully accounted for in the RFC determination.